UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-60875-CIV-COHN/SELTZER

FIRST MICHIGAN BANK, n/k/a
TALMER BANK &TRUST,

       Plaintiff,

vs.

M/V THE GRAND FLORIDIAN, et al.,

       Defendants.

_____/

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S ACTION TO FORECLOSE SHIP MORTGAGE AND DEFENDANTS' COUNTERCLAIM AND AFFIRMATIVE DEFENSE

Plaintiff First Michigan Bank, n/k/a Talmer Bank & Trust, ("the Bank") brings this admiralty and maritime action and against Grand Floridian Marine Leasing, LLC (the "Grand Floridian Co.") and its president and sole owner, Cullan F. Meathe ("Mr. Meathe"), to collect amounts allegedly due and owing under a business loan agreement, promissory note, security agreement, unlimited guaranty, and first preferred ship mortgage (collectively, the "loan agreements").[1]  In response, Mr. Meathe and the Grand Floridian Co. assert a counterclaim for damages against First Michigan Bank for tortious interference with an advantageous business relationship and the affirmative defense of prevention of performance.

The court conducted a bench trial in this case from May 10, 2011 to May 12, 2011.[2]  Having fully considered the testimony and evidence presented together with the arguments of counsel, the

---

[1] The amended complaint also names M/V The Grand Floridian as a defendant.  However, M/V The Grand Floridian was dismissed from this action by court order dated June 24, 2010.  *See* DE # 13.

[2] This case was assigned initially to the Honorable James I. Cohn, who handled all pretrial matters.  As the trial date approached, however, Judge Cohn was occupied with a lengthy trial and, therefore, he transferred, and the undersigned accepted, the case for trial.

court finds in favor of First Michigan Bank on its claim and against Mr. Meathe and the Grand Floridian Co. on their counterclaim and affirmative defense.  In accord with Federal Rule of Civil Procedure 52(a), the court now makes the following

### FINDINGS OF FACT

1.  The plaintiff, First Michigan Bank, now known as Talmer Bank & Trust, is a Michigan banking corporation.  On April 30, 2010, at the urging of federal bank regulators, First Michigan assumed the assets and liabilities of CF Bancorp, which was previously known as Citizens First Savings Bank.  Included in this was the loan portfolio for Cullan Meathe and his companies.

2.  Cullan Meathe is an entrepreneur who had business interests in Michigan and Florida.  He was a significant client of First Citizens, having borrowed over $40 million dollars from the bank.  Estimates valued his loans as amounting to 6.3% of the bank's loan portfolio.

3.  Approximately fifteen years ago, Mr. Meathe met Matthew Talchick ("Mr. Talchick") who was working at a restaurant in South Florida.  They became friends and decided to go into the charter boat business.  The plan was to focus on corporations that wanted to enhance a meeting or event with a dinner cruise on a yacht going up and down Florida's intracoastal waterway.  Mr. Meathe agreed to acquire a yacht and train Mr. Talchick on the chartering business.  Mr. Talchick, in turn, agreed to oversee the day-to-day operations of the yacht and business.  The venture proved successful and after some time Mr. Meathe replaced the first yacht with a second one.

4.  The third vessel – initially named the "Sir Winston," but renamed "The Grand Floridian" – is the subject of this action.  Mr. Meathe decided to purchase it by obtaining a loan for $ 3.6 from Citizens First.  The Grand Floridian (also referred to as the "yacht"), is a 126-foot vessel that was custom built in 2004.  In his negotiations with the bank, Mr. Meathe disclosed the particulars of his business relationship with Mr. Talchick and told the Bank that, although he was purchasing the yacht, Mr. Talchick would be operating it under a charter agreement and providing dinner cruises.  Mr.

Meathe also informed the bank that Mr. Talchick would be responsible for making the monthly principal and interest payments on the loan and for maintaining the yacht.

5.   In January 2006, the bank loaned Mr. Meathe's company, the Grand Floridian Co., $3.6 million to purchase the yacht.  In return, the bank acquired a first preferred ship mortgage over the yacht, an unlimited guaranty from Mr. Meathe, and a security agreement from the Grand Floridian Co. Of particular significance, the ship mortgage required the Grand Floridian Co. to: (1) "obtain and maintain insurance with respect to the Vessel and its business operations"; (2) "maintain all governmental licenses, permits, consents and approvals [including U.S. Coast Guard certification] necessary for it to operate the Vessel for hire or charter in full force and effect"; and (3) "reimburse [the bank] on demand" if the bank made "any expenditures" as a result of a "default in the observance of any of the covenants in [the] Mortgage . . ., including . . . the obligation of insurance."

6.   In May 2006, Mr. Meathe entered into a  bareboat charter agreement with Mr. Talchick, under which Mr. Meathe leased the yacht to Mr. Talchick for a period of ten years.  The agreement called for Mr. Talchick to pay the monthly principal and interest payment to the bank and, after two years, an additional monthly management fee of $6,000 to Mr. Meathe.  In addition, the agreement provided that Mr. Talchick was responsible for all of the yacht's expenses, including insuring it and maintaining coast guard certification.

7.   Unfortunately, the economy began to deteriorate shortly after Mr. Meathe purchased the yacht.  This caused several corporate clients to reign in spending and cancel waterway cruises associated with business meetings.  As the economy worsened, Mr. Talchick's business plummeted. In fact, the business was unable to generate enough profit to make the required loan payments to the Bank.

8.   In February 2007, the bank and Mr. Meathe agreed to a loan modification to help him weather the financial storm.  Mr. Meathe signed a "Business Loan Agreement" and "Promissory

Note," which modified the loan to require interest-only payments for the next seven months.

9  Toward the end of 2008, Mr. Meathe authorized Mr. Talchick to talk to the Bank about another loan modification.  The aim was to pay interest only again for a period of time.  Mr. Talchick spoke to the person in charge of Mr. Meathe's loan portfolio, Janisse Nagel ("Ms. Nagel"), Vice President of lending at the Bank, about the slowdown in business and proposed that the loan be modified.  In November 2008, Mr. Meathe and the Bank executed a "Change in Terms Agreement," modifying the loan repayment terms from interest and principal payments to interest payments only.  A year later, Mr. Talchick talked to Ms. Nagel about a second loan modification.  In December 2009, a second "Change in Terms Agreement" was executed, extending the interest-only payment term for an additional year.  Despite the loan modifications, however, Mr. Talchick still struggled to pay the loan.  When Mr. Talchick failed to make a payment, Ms. Nagel would call Mr. Meathe, and each time Mr. Meathe would make the payment for Mr. Talchick.

10.  During this same period, the bank came under scrutiny by federal bank regulators.  As a result, the bank was increasingly sensitive about the risk associated with its outstanding loans, including the one involving The Grand Floridian.  Ms. Nagel explained that one of her responsibilities during this period was to "tighten up" existing loans that were being restructured.  Thus, in early 2010, she decided that it was in the bank's best interest to obtain an accurate revaluation for the yacht.  Due to her admitted lack of experience with nautical loans, she turned to Mr. Talchick for a referral to a marine expert.  He suggested Richard Paine ("Mr. Paine"), a New York-based marine finance consultant who had prior banking experience and operated a company that assisted third parties in obtaining financing for large vessels.   Eventually, the bank retained Mr. Paine who, in turn, subcontracted with a St. Louis firm to provide a "desktop appraisal." (A valuation done without a physical survey of the vessel.)  The appraisal valued The Grand Floridian at approximately $1.1 million.  Obviously this was far below  the amount of debt ($3.6 million).  Moreover, because Ms.

Nagel had become aware of ongoing problems between Mr. Talchick and Mr. Meath, which threatened the continued viability of their business relationship, she also asked Mr. Paine for information and advice on what steps would be required if the bank had to repossess and liquidate the yacht.

11.   Unbeknown to the bank, Mr. Talchick retained Mr. Paine to investigate the possibility of obtaining financing so that he might purchase The Grand Floridian.

12.   In early March 2010, Mr. Talchick approached the bank and expressed his interest in purchasing The Grand Floridian.  The bank responded by informing him that it could not deal with him on this issue and that he would have to resolve the matter with Mr. Meathe.

13.   Another intervening event, which affected the parties interaction with one another, merits comment.  Sometime in 2010, the Bank of Montreal, together with a consortium of banks – including Citizens First – instituted suit against Mr. Meathe in the United States District Court for the Northern District of Illinois.  The allegations, which were never proven, asserted that Mr. Meathe had fraudulent misappropriated business loan proceeds for his personal use.  From Mr. Meathe's perspective, his relationship with Ms. Nagel changed in the sense that her calls to him were limited to collecting payments that Mr. Talchick has failed to make.  From Mr. Talchick's perspective, Mr. Meathe became unreachable because he was more and more involved in the defense of the law suit.

14.   On March 23, Mr. Talchick's lawyer contacted Mr. Meathe's lawyer for permission to deal "directly with [the bank] for the purchase of the M/V Grand Floridian."  Mr. Meathe answered in the negative, and reminded Mr. Talchick of his obligations under the bareboat charter agreement.

15.   In February and March of 2010, it was clear that Mr. Talchick was extremely unhappy in his business arrangement with Mr. Meathe.  Mr. Talchick freely shared this information with Ms. Nagel, on occasion saying he wanted to terminate the relationship and might cancel efforts to have the yacht recertified by the Coast Guard.  On other occasions he indicated his intention to move forward with recertification.  Believing that Mr. Talchick was merely venting and noting that he tended to

waiver back and forth, Ms. Nagel did not convey Talchick's remarks to Mr. Meathe.  Rather, on March 16, 2010, she sent an e-mail to Mr. Meath which noted the upcoming March 31st deadline for recertification, stated that the failure to obtain recertification would constitute a default, noted the significant costs involved (approximately $150,000), and indicated that the bank would not underwrite these costs. In response, Mr. Meathe asked whether Ms. Nagel had spoken to Mr. Talchick about the certification.  She did not respond to his question.

16.  At no time during the interaction between Ms. Nagel and Mr. Talchick did she -- or anyone else associated with the bank -- suggest, counsel or encourage Mr. Talchick not to fulfill his contractual obligations to Mr. Meathe and his company.

17.  On March 26, 2010, Mr. Talchick, through counsel, notified Mr. Meathe that he was (1) terminating the bareboat charter agreement, (2) cancelling the appointment that had been made to haul the yacht out of the water for its recertification inspection, and (3) removing the insurance on the yacht, effective April 15th.  Suffice it to say that Mr. Meathe and the bank went into crisis mode as a result of Mr. Talchick's action.

18.  Mr. Meathe testified that Mr. Talchick owed him "several hundreds of thousands of dollars" at the time of the termination.  Presumably, the sum consisted of the $6,000 monthly management fee payments that Mr. Talchick failed to make and the interest-only payments that Mr. Meathe paid the bank when Mr. Talchick was unable to do so.

19.  As previously mentioned, the recertification deadline for The Grand Floridian was  March 31, 2010. [3]  To obtain recertification, the yacht had to go through a costly inspection process at a boat yard with facilities to dry dock a yacht as large as The Grand Floridian.  If the certification was not renewed, the yacht could not be used for the business.  Further, the failure to maintain the certification

---

[3]  The U.S. Coast Guard and the Code of Federal Regulations require that passenger vessels carrying six or more paying passengers be inspected and comply with the Coast Guard's Passenger Vessel Safety Program.

on the yacht would constitute an event of default under the mortgage. As of early March 2010, Mr. Talchick had a reservation at a ship yard to have the yacht recertified before March 31, 2010.

20. Mr. Meathe undertook immediate efforts to rectify the situation. He obtained the keys to the yacht and secured it, found a new location to dock the yacht, had the yacht cleaned and inventoried, and hired a new captain and charterer. Further, he made an appointment at a ship yard for April 2010 and spent over $50,000 toward the recertification process. Nonetheless, Mr. Meathe never succeeded in having the yacht recertified.

21. On April 5, 2010, the bank sent Mr. Meathe a notice of default, informing him that he defaulted "under the Mortgage due to the failure to re-certify the hull inspection required by the US Coast Guard on or before March 31, 2010."

22. On April 9, 2010, the bank discovered that the insurance on the yacht had been terminated. Ms. Nagel testified that this was an "absolutely enormous event." She immediately contacted Mr. Meathe, and warned him that if he did not obtain insurance immediately, the bank would have to acquire a forced placed insurance policy, the costs of which would be Mr. Meathe's responsibility. Mr. Meathe was unable to find his own policy, and on April 14, 2010, the bank obtained a forced placed insurance policy for $46,190.64. Mr. Meathe never paid any portion of this expense. His explanation, despite having received a notice of default for nonpayment of insurance costs, was that "[the bank] never provided me with an invoice."

23. On April 21, 2010, the bank sent Mr. Meathe a notice of default, "advis[ing] of a default under the Mortgage due to the failure to maintain insurance on the Grand Floridian . . ., as required pursuant to . . . the Mortgage." The letter informed Mr. Meathe that the bank obtained forced place insurance and demanded that he pay for the insurance policy on or before May 5, 2010. The letter explained that "[r]eimbursement of such advances . . . is required on demand in accordance with the terms of . . . the Mortgage." Furthermore, the letter stated that the forced place insurance policy did

"not provide the minimum amount of insurance and all other coverage" required under the mortgage and that "all insurance required pursuant to . . . the Mortgage [must] [b]e in place on or before May 21, 2010."

24.  Although Mr. Meathe did obtain an insurance policy, he did not do so until May 28, 2010. And there is at least an indication in the record that the policy was cancelled for nonpayment. Irrespective of that, the court finds that the bank gave Mr. Meathe a reasonable period to cure the default by obtaining insurance by May 21, 2010, and he failed to do so.  And, as stated above, Mr. Meathe never paid the bank for the forced placed insurance policy.

25.  The bank filed this action on May 25, 2010.  Although the bank sought and obtained a warrant of arrest, *in rem*, against the yacht, the defendants voluntarily surrendered the yacht to the bank on June 2, 2010.  Since then, the bank has attempted to sell the yacht, but the yacht remained unsold as of the date of trial.

26.  Mr. Meathe made all required loan payments through March 2010, but failed to make any payments thereafter.  As of April 11, 2011, the defendants owed the bank $3,685,478.86 in principal and interest, $27,913.39 in late fees, and $47,690.00 for the forced place insurance policy, for a total of $3,761,082.25.[4]  In addition, interest is accruing on the loan at the per diem daily rate of $393.33 from April 11, 2011 until the date a judgment is entered.

Based on the foregoing, the court reaches the following

## CONCLUSIONS OF LAW

1.  The court possesses federal subject-matter jurisdiction under 28 U.S.C. § 1333 because the plaintiff's complaint is a "civil case of admiralty or maritime jurisdiction," and under 46 U.S.C. § 31325 because the plaintiff's suit is a "civil action" to enforce a "preferred mortgage lien" on a

---

[4]  The applicable interest rate under the 2009 "Change In Terms Agreement" is the Wall Street Journal Prime Rate plus a margin of .75 percentage point.  The Wall Street Journal Rate has been 3.25% since December 2008.  Thus, an interest rate of 4.0% applies to the loan.

mortgaged vessel.

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida.

3.  Under federal maritime law, "where the parties have included a choice of law clause, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Services, Inc..*, 851 F.2d 1514, 1517 (5th Cir. 1988).  Each of the loan agreements in this case contains a choice of law provision designating Michigan law.  Additionally, Michigan has substantial ties to the parties and transaction, and Michigan contract law does not conflict with the fundamental purposes of maritime law.  Thus, the court will apply Michigan law to the bank's claim for breach of contract.

4.  Under Michigan law, the elements of a breach of contract claim are: (1) a contract exists between the parties; (2) the terms of the contract require performance of certain actions; (3) at least one of the parties breached the contract; and (4) that the breach of the contract caused the other party injury. *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999).

5.  Here, it is undisputed that there was valid and enforceable contracts between the parties. The contracts required Mr. Meathe and the Grand Floridian Co. to maintain U.S. Coast Guard certification on the yacht, to maintain adequate insurance on the yacht, and to pay for any advances provided by the bank to remedy a default.  Mr. Meathe and Grand Floridian Co. breached these each of these obligations.  The certification on the yacht expired on March 31, 2010 and was never renewed. Further, the insurance policy on the yacht was cancelled on April 9, 2010, and the defendants failed to obtain a new policy within the reasonable time period given by the bank.  Moreover, the defendants failed to reimburse the bank for the forced placed insurance policy.  Accordingly, the court concludes that the defendants have breached the loan agreements.

6. The defendants assert the affirmative defense of prevention of performance.   Under

9

Michigan law, "a party to a contract cannot prevent, or render impossible, performance by the other party and still recover damages for nonperformance." *Kiff Contractors, Inc. V. Beeman*, 159 N.W.2d 144, 146 (Mich. Ct. App. 1968).

7. In addition, the defendants assert a counterclaim for tortious interference with a business relationship. The parties agree that this claim is governed by Florida law. The elements of a claim for tortious interference with a business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So.3d 1090, 1094 (Fla. 4th DCA 2009).

8. The Defendant, Mr. Meathe, has failed to establish either of the asserted defenses. The court credits the testimony of Ms. Nagel that she neither encouraged nor colluded with Mr. Talchick to breach his contractual obligations with Mr. Meathe. Ms. Nagel's contact with Mr. Talchick was authorized by Mr. Meathe and was wholly proper as an effort to preserve an existing banking relationship by renegotiating the terms of the loan agreement. Ms. Nagel's failure to convey to Mr. Meathe information about Mr. Talchick's dissatisfaction with his business arrangement with Mr. Meathe in no way constitutes tortious interference or prevention of performance. To the contrary, when the bank learned of Mr. Talchick's dissatisfaction, it contacted Mr. Meathe to remind him of the deadline for and the cost of recertification. Furthermore, the bank was fully justified in taking precautionary action to understand its risk and prepare for the possibility of repossession in the event of default. As previously explained, both the counterclaim and affirmative defense are premised on the allegation that Ms. Nagel encouraged Mr. Talchick to breach the bareboat charter agreement, and then helped him cause a default of the loan so that he could buy the yacht. The court, however, has found no credible evidence to support these contentions. To the contrary, the court has found that the

10

Memorandum Opinion
First Michigan Bank v. M/V The Grand Floridian, et al.
Case No. 10-60875-CIV-COHN/SELTZER

defendants failed to prove that Ms. Nagel intentionally and unjustifiably interfered with Messrs.

Meathe's and Talchick's relationship by the preponderance of the evidence.  Similarly, the defendants

failed to prove by the preponderance of the evidence that Ms. Nagel's actions prevented defendants

from performing their contractual obligations.

**DECRETAL PROVISION**

Based on the foregoing, it is **ORDERED** and **ADJUDGED** that:

1.      The court finds in favor of the plaintiff on its amended complaint to foreclose ship

mortgage and finds that the defendants are indebted to the plaintiff in the amount of

$3,761,082.25, plus interest accruing at a daily rate of $393.33 from April 11, 2011.

2.      The court finds in favor of the plaintiff on the defendants' counterclaim for damages.

3.      Pursuant to Fed. R. Civ. P. 58(a), the court will enter final judgment by separate order.

4.      There being nothing further for the court to resolve in this matter, the Clerk is directed

to **DENY** all pending motions as moot and mark this case as **CLOSED**.

**DONE** and **SIGNED** in Chambers in West Palm Beach, Florida, this 16th day of June, 2011.

Daniel T. K. Hurley
U.S. District Judge

*Copies provided to counsel of record*

For updated court information, visit unofficial Web site
at http://www.judgehurley.com